| | |
|---|---|
| KESHA T. WILLIAMS ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | CIVIL ACTION NO. _____ |
| STACEY A. KINCAID; ) | |
| ) | COMPLAINT |
| Serve: ) | |
| Stacey A. Kincaid ) | JURY TRIAL DEMAND |
| Fairfax County Sheriff's Office ) | |
| 4110 Chain Bridge Road ) | |
| Fairfax, VA 22030 ) | |
| ) | |
| and ) | |
| ) | |
| MAXIM HEALTHCARE ) | |
| SERVICES, INC.; ) | |
| ) | |
| Serve: ) | |
| Corporation Service Company ) | |
| Registered Agent ) | |
| 100 Shockoe Slip Floor 2 ) | |
| Richmond, VA 23214-4100 ) | |
| ) | |
| and ) | |
| ) | |
| DOES (1-15), ) | |
| ) | |
| Defendants. ) | |
| ) | |

## **COMPLAINT**

Plaintiff Kesha T. Williams ("Ms. Williams," or "Plaintiff"), by counsel, and for her Complaint against Fairfax County Sheriff Stacey A. Kincaid, Maxim Healthcare Services, Inc., and certain unidentified custody and health officials at the Fairfax County Adult Detention Center, (collectively, "Defendants"), states as follows:

## INTRODUCTION

1. Plaintiff Kesha T. Williams ("Ms. Williams," or "Plaintiff"), at all times relevant to this Complaint, was incarcerated by the Fairfax County Sheriff's Office at the Fairfax County Adult Detention Center in Fairfax County, Virginia.

2. Ms. Williams is a transgender woman, an individual whose gender identity (female) is different from the gender (male) assigned to her at birth.

3. Ms. Williams was diagnosed by the Fairfax County Sheriff's Office with gender dysphoria (previously known as Gender Identity Disorder), a serious medical condition characterized by strong cross-gender identification, and strong and persistent discomfort about one's assigned sex.

4. Prior to being incarcerated, Ms. Williams expressed her gender identity as a woman, presented as a woman, and lived full-time as a woman.

5. Ms. Williams sought appropriate treatment for her gender dysphoria while in custody of the Fairfax County Adult Detention Center, including access to feminizing hormones and the ability to live as a woman while incarcerated.

6. Defendants denied Ms. Williams the medical treatment and accommodations she required and denied Ms. Williams opportunities provided to inmates who were not transgender and did not suffer from gender dysphoria.

## NATURE OF ACTION

7. This is an action for damages under 42 U.S.C. § 1983 ("Section 1983") stemming from the treatment of Ms. Williams during her incarceration at the Fairfax County Adult Detention Center. Ms. Williams seeks relief due to Defendants' failure to provide medical

treatment and failure to protect Ms. Williams from harm in violation of the Eighth Amendment to the United States Constitution. Ms. Williams further seeks relief for Equal Protection Violations based on her sex and medical diagnosis under the Fourteenth Amendment.

8. This action states an additional claim for damages under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., and/or Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a, for Defendants' discrimination against Ms. Williams in violation of these Acts based on her disability.

9. This action states an additional claim for damages arising from Defendants' negligence in violation of the common law of Virginia.

10. Ms. Williams seeks injunctive and declaratory relief and damages to remediate Defendants' violations of her rights.

11. Plaintiff seeks reasonable attorneys' fees under 42 U.S.C. § 1988 ("Section 1988") and other applicable laws.

## PARTIES

12. Ms. Williams is a Black transgender woman.

13. Defendant Stacey A. Kincaid ("Kincaid") is the Sheriff of Fairfax County.

14. The Fairfax County Sheriff's Office is the local agency responsible for the operation of the Fairfax County Adult Detention Center ("FCADC").

15. Defendant Maxim Healthcare Services ("Maxim Health") is a private, for-profit corporation contracted to provide healthcare, including medical and mental health treatment services, to inmates in the custody of the FCADC.

16. As FCADC's contract medical provider, Maxim Health is responsible for ensuring that proper medical, dental, psychiatric and psychological services and treatment are provided to inmates jailed at the facility.

17. Does 1-9 ("Custody Does") are custody supervisors and officers who were at all times relevant to the actions and omissions described herein, employed by the Fairfax County Sheriff's Office, and responsible for the implementation of the FCADC's policies and procedures, as well as the welfare of inmates, including Plaintiff.

18. Custody Does supervised and/or participated in the denial of Plaintiff's requests complained of herein. The identities of Custody Does are unknown and not discoverable to Plaintiff without relevant documents from her custody file, to which Plaintiff does not currently have access. Plaintiff will substitute the true names of Custody Does when Plaintiff is able to ascertain their identities through discovery.

19. Does 10-15 ("Health Care Does") are medical providers and staff who were at all times relevant to the actions and omissions described herein and were engaged to provide medical services at FCADC.

20. Health Care Does were responsible for ensuring provision of appropriate medical care to Plaintiff and/or participated in the denial of adequate and necessary medical treatment to Plaintiff for gender dysphoria. The identities of Health Care Does are unknown and not discoverable to Plaintiff prior to discovery in this matter. Plaintiff will substitute the true names of Health Care Does when Plaintiff is able to ascertain their identities through discovery.

# JURISDICTION AND VENUE

21. This Court has federal question jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this action asserts a deprivation of one or more federal constitutional rights under Section 1983.

22. This Court has supplemental jurisdiction over Ms. William's state law claims against Defendants under 28 U.S.C. § 1367(a) because the facts of the federal and state claims both occurred in this judicial district and form part of the same case or controversy.

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events described in this action took place within this judicial district.

# FACTS

*Gender Dysphoria is a Serious Medical Condition Requiring Treatment*

24. Gender Dysphoria is a diagnosable and treatable condition recognized by the American Psychiatric Association and included in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V"), as well as the International Classification of Diseases-10 (World Health Organization).

25. Gender Dysphoria is not a mental illness or disorder. Rather, "gender dysphoria" is a diagnostic term that refers to clinically significant distress associated with an incongruence or mismatch between a person's gender identity and assigned sex. An individual can identify as transgender without suffering from Gender Dysphoria. However, if an individual does suffer from Gender Dysphoria, severe cases can result in a person's inability to function in everyday life.

26. Gender Dysphoria is highly treatable. With appropriate treatment, individuals with Gender Dysphoria can be fully cured of all symptoms.

27. When not properly treated, Gender Dysphoria is often associated with dangerous related conditions such as depression, substance abuse, self-mutilation, suicidal ideations, and suicide. Forty percent of persons identifying as transgender attempt suicide, nearly nine times the national average of 4.6 percent, according to the 2015 National Transgender Discrimination Survey.[1]

***Standards of Care Applicable to Gender Dysphoria***

28. The World Professional Association for Transgender Health ("WPATH") is the leading international organization focused on transgender health care. WPATH has more than 1,000 members throughout the world consisting of physicians, psychiatrists, psychologists, social workers, surgeons, and other health professionals who specialize in the diagnosis and treatment of gender dysphoria. WPATH's Standards of Care (the "Standards of Care") are the prevailing standards of care used by mental health providers and medical professionals treating gender dysphoria.

29. The Standards of Care require that a competent medical professional with knowledge and expertise in gender dysphoria evaluate a patient for appropriate and necessary treatment options. This medical treatment not only improves a patient's quality of life, but also limits the development of mental health issues which often accompany lack of treatment.

---

[1] Available at http://www.transequality.org/sites/default/files/docs/usts/USTS%20Full%20Report%20-%20FINAL%201.6.17.pdf.

30. The Standards of Care set forth treatment options for gender dysphoria including: changes in gender expression and role; hormone therapy; surgery to change primary and/or secondary sex characteristics; and psychotherapy addressing the negative impact of gender dysphoria and stigma on mental health, alleviating internalized transphobia, enhancing social and peer support, improving body image and promoting resilience.

***Defendant's Failure to Provide Treatment to and Misgendering of Plaintiff***

31. Prior to her incarceration, Probation and Parole Officer Steven Berger reviewed Ms. Williams' Sentencing Guidelines and requested that, in addition to incarceration, Ms. Williams' be required to undergo a mental health evaluation and appropriate treatment.

32. Ms. Williams was booked into FCADC on November 16, 2018.

33. On this date, Ms. Williams underwent an initial medical evaluation to classify her gender and determine her assignment to the male or female side of the facility.

34. During this evaluation, Ms. Williams informed the medical provider she is transgender, that she lives full-time as a woman and identified as a woman, that she has been on hormone treatment for the past fifteen (15) years, and that her current hormone medication regimen consists of a daily pill and a bi-weekly injection.

35. This initial evaluation included a mental health screening, from which FCADC determined not to refer Ms. Williams for mental health treatment or counseling.

36. Ms. Williams completed a medical records release form on November 16, 2018 authorizing FCADC to obtain information about Ms. Williams' hormone treatment from her personal medical provider.

37. Following this evaluation, FCADC classified Ms. Williams as "male," assigned her to the male side of the facility, and provided her with the same uniform worn by all other male inmates.

38. Ms. Williams' medical plan provided that Maxim Health staff were to contact Ms. Williams' physician and follow up with Ms. Williams once her medical records were received.

39. FCADC failed to provide the pre-admission medication Ms. Williams required and did not consult her medical records or physician prior to stopping the medication.

40. On or about November 28, 2018, Ms. Williams made a written request to the facility's ADA Compliance Officer seeking to be provided with a bra as a reasonable accommodation.

41. On or about November 30, 2018, Ms. Williams saw a medical provider to determine if a medical need existed for the provision of a bra to Ms. Williams.

42. During this medical visit, FCADC informed Ms. Williams they were still waiting on medical records from Ms. Williams' health care provider and could not provide her with hormone treatment until her records were received.

43. During this medical visit, FCADC also informed Ms. Williams she had been medically cleared for the Workforce Program available at the facility.

44. On or about December 1, 2018, Ms. Williams requested a visit from a nurse, known as a "sick call visit," due to symptoms she was experiencing as a result of the sudden cessation of her hormone therapy treatment.

45. During this medical visit, FCADC again requested Ms. Williams to complete a medical records release form authorizing FCADC to obtain information about Ms. Williams

hormone treatment from her personal medical provider, despite Ms. Williams having already completed such a release more than two (2) weeks prior.

46. During this medical visit, Ms. Williams requested she be permitted mental health treatment and counseling.

47. On or about December 10, 2018, FDCADC granted Ms. Williams medical authorization to receive a bra.

48. During the three-week period when Ms. Williams did not have the bra she needed, she suffered back pain and embarrassment.

49. On or about December 11, 2018, FCADC initiated Ms. Williams' hormone therapy treatment, which consisted of an injection once every two weeks and a daily oral hormone medication.

50. On February 27, 2019, Ms. Williams requested to speak to an ADA Compliance Officer to request the provision of women's underwear.

51. A medical provider at FCADC saw Ms. Williams on March 3, 2019 to determine whether to authorize Ms. Williams to wear women's underwear in lieu of the men's boxer shorts she had been provided.

52. On March 4, 2019, a doctor reviewed the medical providers notes and determined that, despite Ms. Williams' history of gender dysphoria, her request for women's underwear should be denied because there was "no indication for ordering women panties."

53. In or around late March 2019, Ms. Williams was accepted to participate in FCADC's Workforce Program through the Alternative Incarceration Branch (AIB) of the facility.

54. Upon her acceptance into the Workforce Program, Ms. Williams' medications were to be released by FCADC upon Ms. Williams' agreement they be self-administered.

55. Ms. Williams missed several days of her oral hormone medication before it was provided by FCADC.

56. FDADC delayed the provision of Ms. Williams' hormone injections, and failed to provide Ms. Williams the hormone injection she was scheduled to receive on April 22, 2019.

57. FCADC failed to provide Ms. Williams the subsequent hormone injection she was scheduled to receive on May 6, 2019.

58. On May 9, 2019, Ms. Williams submitted a written complaint to FCADC noting she had not been receiving her required treatment.

59. On May 20, 2019, Ms. Williams was released from FCADC custody.

60. At no point during Ms. Williams' incarceration did FCADC permit her to undergo mental health counseling or treatment.

***Defendant's Discrimination Against Ms. Williams Based on Sex and Medical Diagnosis***

61. Throughout her incarceration at FCADC, Ms. Williams experienced harassment by Individual Defendants based on her sex, sex-based stereotypes, and/or her gender identity.

62. Custody Does primarily referred to Ms. Williams as "mister," "sir," "he," or "gentleman," despite her repeated requests to be referred to as "ma'am," "her," or by her legal name.

63. In January 2019, during a "shakedown" search of Ms. Williams' housing unit, Ms. Williams requested that a female, rather than a male, deputy search her person. A female deputy was present during this search.

64. Custody Doe told Ms. Williams, "Sir, you are a male and I need to search you," before proceeding to pat Ms. Williams down in a highly aggressive manner.

65. Custody Doe's search of Ms. Williams resulted in physical injury to Ms. Williams, including bruising to Ms. Williams' right breast. This injury caused Ms. Williams pain for several days.

66. After completing his search of Ms. Williams' person, Custody Doe stepped to side of the room and gestured toward Ms. Williams while interacting with other deputies. Custody Doe appeared to mock Ms. Williams and make light of his actions in searching her person.

67. Custody Does repeatedly subjected Ms. Williams to cross-gender searches despite her polite requests to be searched by a female deputy.

68. On at least one occasion, Custody Does threatened to place Ms. Williams in solitary confinement if she did not submit to a search of her person by a male deputy.

69. Beginning in December 2018, Ms. Williams made her first request to FCADC for consideration in the facility's Workforce Program (the "Program").

70. Throughout January 2019, Ms. Williams continued to make written requests to be considered for the Program.

71. Ms. Williams did not receive a response to any of her requests. Meanwhile, Ms. Williams witnessed inmates who had been incarcerated for a shorter time than herself receive transfers to the Program.

72. On February 11, 2019, Ms. Williams made an additional written request to be considered for the Program. On this request, Ms. Williams noted that she had requested

consideration on multiple prior occasions and believed she was being discriminated against and excluded from the Program because she was transgender.

73. On February 29, 2019, FCADC responded for the first time to Ms. Williams' requests to be considered for the Program.

74. FCADC's response provided that no prior written request to be considered for the Program had been received from Ms. Williams, and instructed Ms. Williams to make additional requests for consideration.

75. On March 5, 2019, Ms. Williams submitted two additional requests to be considered to the Program.

76. In late March 2019, FCADC finally acknowledged and reviewed Ms. Williams' requests and granted her permission to participate in the Program.

**COUNT I**
**Civil Rights Violation of 42 U.S.C. § 1983: Eighth Amendment**
**Deliberate Indifference**

*Against Defendants Health Care Does and Maxim Health*

77. The allegations in the foregoing paragraphs are incorporated as if realleged herein.

78. Defendants knew of Ms. Williams' history of the serious medical condition of gender dysphoria and knew, without necessary treatment, this condition would cause Ms. Williams serious mental distress.

79. Defendants knew of Ms. Williams' history of depression, and knew, without necessary treatment, the symptoms of gender dysphoria and depression would cause Ms. Williams serious mental distress and place her at significant risk of harm.

80. Defendants Health Care Does and Maxim Health are responsible for providing adequate and necessary medical treatment to individuals incarcerated at FCADC, including treatment for persons diagnosed with gender dysphoria and depression like Ms. Williams.

81. Defendants Health Care Does and Maxim Health failed to provide adequate and necessary treatment to Ms. Williams consistent with prevailing medical standards of care for gender dysphoria and depression.

82. Defendants Health Care Does and Maxim Health delayed Ms. Williams' treatment and interfered with her access to treatment she required.

83. Defendants knew about and ignored an excessive risk to Ms. Williams' health that resulted from failing to provide her medically necessary treatment in a timely and uninterrupted manner.

84. At all times relevant to this Complaint, Defendants Health Care Does and Maxim Health remained deliberately indifferent to Ms. Williams' medical need to be adequately treated for gender dysphoria, including regular and consistent provision of medical treatments and accommodations that would alleviate Ms. Williams' serious medical symptoms.

85. Defendants Health Care Does and Maxim Health knew of Ms. Williams' need for treatment for serious medical conditions, gender dysphoria and depression, but failed to take reasonable measures to address Ms. Williams' continued pain and suffering resulting from her inadequately treated conditions.

86. Defendants Health Care Does' and Maxim Health's denial of necessary medical treatment for gender dysphoria and depression has caused irreparable harm and unnecessary suffering to Ms. Williams, including severe anxiety and distress resulting in emotional and psychological harm.

87. Defendants Health Care Does' and Maxim Health's failure to provide medical treatment, including mental health treatment for known serious conditions, is intolerable to fundamental fairness and shocks the conscience.

88. Defendants Health Care Does' and Maxim Health's failure to provide necessary medical treatment to Ms. Williams violated the Eighth Amendment to the United States Constitution. As a direct result of Defendants Health Care Does' and Maxim Health's actions, Ms. Williams has suffered damages including, without limitation, pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

89. Defendants Health Care Does and Maxim Health, by engaging in the aforementioned acts and/or omissions and/or in ratifying such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Ms. Williams, thereby justifying the award of punitive damages in an amount to be determined at trial.

**COUNT II**
**Equal Protection Violation of 42 U.S.C. § 1983: Fourteenth Amendment Discrimination Based on Sex**

*Against All Individual Defendants and Maxim Health*

90. The allegations in the foregoing paragraphs are incorporated as if realleged herein.

91. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

92. Defendants Does and Maxim Health discriminated against Ms. Williams based on her sex by failing to provide adequate and necessary medical treatment for gender dysphoria and

by disciplining Ms. Williams based on sex-based stereotyping about the ways in which Ms. Williams should appear, act, and express herself based on her sex assigned at birth.

93. In particular, Defendants Health Care Does and Maxim Health withheld adequate medical care from Ms. Williams because she is transgender, because she is attempting to transition genders, and/or because of their sex-based belief that people who are assigned the male sex at birth should not receive medically necessary care that feminizes their bodies.

94. Defendants Custody Does threatened Ms. Williams with discipline for her preference that she be searched by a female deputy, purposefully misgendered Ms. Williams when speaking to her, and attempted to prevent her participation in a beneficial workforce program at the facility. Defendants Custody Does engaged in this behavior because Ms. Williams is transgender, because she is attempting to transition genders, and/or because of the sex-based belief that people who are assigned the male sex at birth should display only stereotypically male characteristics, behaviors, or dress.

95. Defendants Custody Does denied Ms. Williams the ability to obtain or purchase women's underwear based on her sex assigned at birth and sex-based stereotypes that she should express herself in a manner that does not include wearing women's underwear or engage in otherwise feminine behaviors.

96. Defendants Does and Maxim Health discriminated against Ms. Williams because of sex, sex stereotyping and/or gender identity and deprived Ms. Williams of her right to equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution.

97. Defendants Does' and Maxim Health's actions were not substantially related to any important government interest, nor were they even rationally related to any legitimate government or penological interest.

98. As a direct result of Defendants Does' and Maxim Health's actions, Ms. Williams has suffered damages including, without limitation, pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

99. Defendants Does and Maxim Health, by engaging in the aforementioned acts and/or omissions and/or in ratifying such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Ms. Williams, thereby justifying the award of punitive damages in an amount to be determined at trial.

**COUNT III**
**Equal Protection Violation of 42 U.S.C. § 1983: Fourteenth Amendment**
**Discrimination Based on Medical Diagnosis**

*Against All Individual Defendants and Maxim Health*

100. The allegations in the foregoing paragraphs are incorporated as if realleged herein.

101. Defendants Health Care Does and Maxim Health failed to provide Ms. Williams adequate treatment because of her diagnosis of gender dysphoria.

102. By official policy, procedure, custom, and/or practice, Defendants Health Care Does and Maxim Health discriminate against transgender inmates diagnosed with gender dysphoria, including Ms. Williams, by providing them with inferior medical care as compared to

similarly situated inmates with medical and mental conditions and/or diagnoses other than gender dysphoria.

103. Defendants Health Care Does' and Maxim Health's discrimination against Ms. Williams based on her diagnosis of gender dysphoria is not substantially related to any important government interest, nor is it even rationally related to any legitimate government or penological interest.

104. Defendants Health Care Does and Maxim Health , by engaging in the aforementioned acts and/or omissions and/or in ratifying such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Ms. Williams, thereby justifying the award of punitive damages in an amount to be determined at trial.

**COUNT IV**
**Discrimination On Basis of Disability**
**Americans with Disabilities Act, 42 U.S.C. § 12101** *et seq*.
**Section 504 of the Rehabilitation Act, 29 U.S.C. §794a**

*Against Defendant Kincaid and Maxim Health*

105. The allegations in the foregoing paragraphs are incorporated as if realleged herein.

106. Based on her diagnosis of gender dysphoria, Ms. Williams suffers from a disability within the meaning and scope of 42 U.S.C. § 1202. Accordingly, Ms. Williams is a member of the class of persons protected by the ADA and Section 504 of the Rehabilitation Act, which makes it unlawful for a public entity and entities receiving federal funds to discriminate against an individual with a disability, or to deny the benefits of the services, programs, or activities of a public entity or entity receiving federal funds to a person with a disability.

107. Defendant Kincaid and Maxim Health discriminated against Ms. Williams because of her disability and denied her the benefits of public services, programs and activities as a result of her disability by, *inter alia*, failing to provide adequate and necessary medical treatment; failing to provide proper and reasonable training to custody and health staff in responding to persons with gender dysphoria; and by depriving Ms. Williams access to programs and activities in a manner detrimental to her health.

108. Defendant Kincaid's and Maxim Health's acts and omissions violated the ADA and Section 504, which prohibit discrimination on the basis of physical and mental disability, and protect persons such as Ms. Williams from the type of injuries and damages set forth herein.

109. As a direct and legal result of Defendant Kincaid's and Maxim Health's actions and omissions, Ms. Williams has suffered and continues to suffer damages including, without limitation, pain and suffering; emotional, psychological, and physical distress; and other pecuniary losses not yet ascertained.

**COUNT V**
**Common Law Negligence**
*Against All Defendants*

110. The allegations in the foregoing paragraphs are incorporated as if realleged herein.

111. Defendants failed to comply with professional standards in the treatment, care, and supervision of Ms. Williams during her incarceration at FCADC. Defendants' failures include but are not limited to: failing to provide timely and necessary medical treatment; punishing Ms. Williams for behaviors and actions reflecting her medical diagnosis and seeking medical treatment by denying her access to programs and activities; and failing to house Ms. Williams safely.

112. Defendants also failed to appropriately supervise, review, and ensure the provision of adequate care and treatment to Ms. Williams by custody and medical staff, and failed to enact appropriate standards and procedures that would have prevented the harm she has experienced.

113. Defendants acted negligently and improperly, breached their respective duties to Ms. Williams, and as a direct and proximate result, Ms. Williams suffered injuries and damages as alleged herein.

114. The negligent conduct of Defendants was committed within the course and scope of their employment.

115. The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Ms. Williams and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff KESHA T. WILLIAMS requests that this Court enter judgment in her favor, and against Defendants on all Counts as follows:

(a) For injunctive and declaratory relief, including but not limited to ordering Defendants to provide inmates with gender dysphoria with adequate and necessary medical care; providing such inmates access to clothing and hygiene items consistent with their gender identity; and declaring unconstitutional and violative of federal law

Defendants' practices in denying Ms. Williams and other similarly situated inmates with adequate and necessary medical treatment; and in addition

(b) For compensatory, general and special damages, in an amount to be determined at trial; and in addition

(c) For punitive damages as to each of Ms. Williams' respective Counts against individual Defendants and Maxim Health in an amount to be determined at trial; and in addition

(d) For attorneys' fees, costs, and expenses incurred by Ms. Williams in this action pursuant to statute; and in addition

(e) Award any further relief this Court deems just and appropriate under the circumstances.

## JURY DEMAND

**PLAINTIFF KESHA T. WILLIAMS DEMANDS A TRIAL BY JURY.**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff Kesha T. Williams demands a trial by jury.

Dated: November 16, 2020              Respectfully,

/s/
Joshua Erlich, VA Bar No. 81298
Davia Craumer, VA Bar No. 87426
Katherine L. Herrmann, VA Bar No. 83203
THE ERLICH LAW OFFICE, PLLC
2111 Wilson Blvd., Ste. 700
Arlington, VA  22201
Tel:    (703) 791-9087
Fax:   (703) 722-8114
Email: jerlich@erlichlawoffice.com
           dcraumer@erlichlawoffice.com
           kherrmann@erlichlawoffice.com